Under the highly deferential AEDPA standard, it is the habeas petitioner's burden to show that the state court not only misapplied federal law, but that its decision was so objectively erroneous that it was erroneous, unreasonable, beyond all fair-minded disagreement. The Appellate Court of Maryland's application of the Brady materiality prong in this case was consistent with Supreme Court precedent and entirely reasonable. Rather than affording that decision the deference that the AEDPA statute requires, the district court in this case substituted its own Brady materiality assessment and granted federal habeas relief to Mr. Martin. That was error and we submit that this court should reverse. I'd like to address a number of facets of this case, but I would like to begin, if I could, by highlighting what the state court got right in this case. At first, the court correctly articulated the Brady materiality test. It cited all of the applicable Supreme Court cases, including Brady itself, Eggers, Bagley, Strickler, and Harrington. The state court assuming that the suppressed computer analysis report would have totally discredited Sherry Carter's testimony was a reasonable application of the Brady materiality prong. It held that Martin had not met his burden of showing that, had the computer analysis been provided to the defense, there is a It is entirely consistent with US Supreme Court precedent. It was not a sufficiency of the evidence test, as Mr. Martin suggests. Can we agree that the state court, at least at a few times, used some language that could have been more precise? Certainly, I think. They used some language that sort of starts to sound like sufficiency, right? I mean, I agree they quoted the correct standard several times, but they also, a few times in shorthanding, it starts to say things that sound like sufficiency to me. I think the court was simply weighing the strength of the state's case, which as we've argued in our brief, I think quite thoroughly, that that is an entirely reasonable application of Brady. Under the Supreme Court's analysis in Smith v. Cain, for example, the Supreme Court observed that evidence impeaching an eyewitness may not be material if the state's other evidence is strong enough to sustain confidence in the verdict. That is essentially what the appellate court was articulating in this case. Can I say something to you? It just seems to be the hardest thing about this for me. If I'm the defense attorney at trial, if I'm the government at trial, this testimony from this former significant other of his, I think, this seems horrendously bad for him. This testimony of like, I saw him researching silencers, that's really, really, really bad, and I guess I just, it seems, it seems difficult. I don't know if it's unreasonable under AEDPA, but it seems difficult for me to argue that impeaching a witness who provided what in some ways is the most devastatingly awful testimony against my client isn't material. That seems like, when they say like, she's not a critical witness, I'm like, really? She seems like a really important witness to me. I think she's certainly a key witness, but I think what your Honor has articulated is fair-minded disagreement. The appellate court was reasonable in weighing the remaining evidence, assuming that the jury would have totally discredited her testimony, and certainly she was a key part of the state's case, but the state court was not objectively unreasonable at looking at all of the other overwhelming evidence. Over, really? Without her? It's overwhelming? I think the Michael Bradley's testimony, for example, is very compelling. I mean, he essentially established that Mr. Martin was up in Maggie McFadden's bedroom taping together the silencer. We have other evidence, including the DNA evidence. I mean, given the disagreement you have with the district court and the appellate court, can we agree at minimum that that testimony could have been clearer? Because I have to say, I've read that testimony again and again and again, and I'm actually kind of having a hard time figuring out what exactly he's testifying to. You're talking about Michael Bradley's testimony? Yes. Sure. Like, who's where and who are we talking about now, and when am I talking about me, and when am I talking about her, and when am I talking about the defendant? His testimony, at least when you're reading a transcript, it is not always super clear who's doing what where. I think that if a careful reading, the court would find that Michael Bradley was testifying that Frank Bradley brought the tape to the kitchen where Martin was, that Martin and Frank then went upstairs to the bedroom with the tape. Bradley came back downstairs, got the bottle, and went back upstairs where Martin was with the bottle, and that is where the bottle of silencer was constructed. Who had the tape? What did he say he saw with the tape? He said that he saw Frank with the tape. Frank with the tape. Frank Bradley, and he brought the tape to the kitchen. Who's he? Who's he? Frank Bradley. Yeah, Frank. Okay, everything is Frank. Saw Frank, Frank brought the tape, and go ahead. Frank Bradley brought the tape to the kitchen. All right. And then they asked him if, where he went with the tape, and he said that Martin went upstairs. Martin went upstairs. He didn't say Martin went upstairs with the tape. He did not say with the tape. He said that Frank Bradley went to the kitchen with the tape, and then they both went upstairs. Right. No one testified that he saw him with the tape. And by the fact, in the tape that was consistent with the tape that was on the Gatorade, whose house was that found in? The tape was in Maggie McFadden's house. And Maggie McFadden, that's the, is that a sister of some of the witnesses? The sister. That. Yeah, sister, right? You know the record. The sister of the, I think the Bradleys. Bradley, right? Did he testify that he, that he testified because of, she was a suspect? Did he say that? Did Michael Bradley testify? Was there testimony like that in this case? I don't think that she was, I don't think that she was ever seriously. I didn't ask you, was she? I said, did he testify? He testified because I think Frank. Did he say that it was related to her, his testimony? Yes. He testified that, if I recall correctly, he testified that Martin was threatening Maggie, and she asked him to testify. She asked him to cooperate because Martin. I'm going to hold you to it. You're saying that, you're saying that he didn't say anything about that he was testifying related to, she wanted him to testify. Yeah, I agree with your honor. Yeah, she, and he testified that he cooperated with the police because Maggie asked him to, because Mr. Martin was threatening her. And not because that she was a suspect at all. That I do not, I don't, I don't believe so. I, if, if you're, if your honor has. No, I'm just asking, I'm asking you the question. I recall from the testimony that he, he testified that he cooperated. This is the strong case you're talking about that Judge Hyden just asked you about. I mean, even you, up and down with the record, you, the witness who, she was a key witness, right? As a matter of fact, didn't he say that this is a person that you can really believe, and he propped her up with the jury in closing arguments? In that sense, correct? Yes. But you, and the authorities knew very well that they had the computer that she identified specifically as being the property of the university, correct, at the time? I would agree that the authorities certainly knew they had a computer. Whether or not that's the computer is still a question, but certainly they had a computer. Wait, can I ask you about that? Judge Gregory, are you on the line? Go ahead, go ahead. So, this whole, is this the same computer question? This whole question has vexed me and perplexed me, and I think, let me just posit by saying, I think there's a plausible argument you can make that maybe it's not the same computer, but I don't know what to do with the fact that in footnote six, the state appellate court, whose decision we're giving extreme deference under AEDPA, said, we are assuming it's the same computer, so it seems to me that as a habeas court, we have to take the state court's word, like, I feel like in habeas cases, the state tells me over and over again, I'm not allowed to second guess the state court, but here the state is trying to get me to second guess the state court. The state court decided this case on the premise that these are the same computer, so I think as a habeas court, we have to assume they're the same computer, notwithstanding your belief that maybe they're not the same computer. I'd love to clarify. So, yes, I absolutely agree with everything you said. As the court, I'm sure, is well aware, federal habeas is sort of a two-step process. Step one is reasonable deference under 2254, and certainly it is our opinion that the appellate court's decision should be looked at exactly what it was, including that footnote, and it was not objectively unreasonable in that regard. Now, with respect to, if the court, in the event that the court decides that the state court's decision is objectively unreasonable, which we don't think the court should, then the court proceeds to de novo review, and under de novo review, the court looks at the entire record and can make a different decision about the weight of the impeachment evidence. What's your best authority for that? I just, I'm just, I mean this sincerely. I'm not aware of a case where a federal habeas court does that. It goes like, so I read what the state court says, and I gave deference to all the factual findings I need to give deference to, and I did all that, and having done that, I've concluded they were, they meet the extraordinarily high AEDPA standard. Cool. But instead of granting a writ, I'm not going to start over and make my own decision, including reassessing all the facts. What is your best authority for the proposition? That's how federal habeas review works. I do not have a case off the top of my head. I've never seen a federal habeas court do that. I assure the court, and I'd be more than happy to submit a supplement to demonstrate to the court that certainly there's a... Wow, that's an even more heads I win, tails you lose than I would normally associate with AEDPA. That like, you give super deference to the state court, if you conclude the state court is so wrong that it satisfies AEDPA, the state then gets another chance to win. It, that's, that's the test. Yes, the court will then proceed to de novo review and review the claim before... I would think that if we conclude 2254 is satisfied, we just affirm the grant of habeas relief. If the court concludes that the state court's decision is objectively unreasonable... Contrary to an unreasonable application of clearly established federal laws declared by the Supreme Court of the United States. If we conclude all that, don't you just... It strips the state court's, it strips the state court's decision of, of deference. But then, yes, the state, this court would then proceed to de novo review and reconsider the claim. And then we can consider the argument that it's not the same computer after all. Absolutely. Absolutely. The state court, as I, as I argued earlier, was, was correct to assess materiality by weighing the remaining evidence to determine whether there's a reasonable probability of a different outcome. And I want to sort of move on in the last few minutes I have to what the district court we think got wrong in this case. And the first and I think most concerning aspect of this, the district court's decision was that it concluded that the Gatorade bottle without Sherry Carter's testimony was simply a Gatorade bottle. And we submit to the court that that is, couldn't be further from the truth. Just simply looking at the photographs of the bottle we have submitted to the court, you can see that clearly it was made for a specific purpose. The record supports that this was a bottle silencer. That is what the jury would have inferred. And the appellate... Do you disagree the state could have prevented better testimony that this was a bottle silencer? Like, we've got like one guy saying I saw a Steven Seagal movie. Like, it feels like this is something that could have just been nailed down a little more. Don't you think? I do not disagree that, you know, in a better situation we could have had a better record, but we are stuck with the record that we have. But ultimately the question is, again, whether the state court's assessment of the record was objectively unreasonable. Counselor, you know, you chuckle and I understand that, but these are serious matters. I mean, the most important thing you have as a human being, as a citizen, is your liberty in terms of your person, your freedom. You talk about a serious case here, and you say, again, as Judge Hyden said, a movie, it looks like something I saw in a movie. It isn't very scientific, but why wouldn't you test the dark powder to see whether that was even gunpowder? I think that they, the detective, I think he was the lead detective, testified, or maybe it was the evidence handler. They weren't concerned about what had happened. They assumed they found the bottle next to a shooting. They weren't really concerned about what it was for, but rather who it was connected to. So they didn't test it for gunshot residue. They tested it for DNA in order to determine who committed the crime and not necessarily what the purpose of the bottle was. Well, you knew enough that you had a so-called expert to say that the Gatorade bottle was consistent with being a silencer. You thought that was important, but not enough that whether or not, in fact, this was gunpowder, it was actually used for that purpose. Let me get back to this. I practiced law for 20 years and did a lot of criminal defense work. In this case, the jury instruction given was devastating, devastating. You can use this evidence that's intentional, that you're destroying, doing away with evidence, and that can be used for the purpose of finding guilt. How do you just take that and say, well, because all of that, you would have gotten the jury instruction on that if she hadn't testified to that. And you take that away and you say that that's not an incredible impact on this case? That is what the appellate court found. That's what they said, but that's unreasonable. I mean, I haven't really tried any cases before, any criminal cases. That is the most devastating one you can have. I disagree that that is an objectively unreasonable application of Brady. How important do you think that instruction is in terms of devastating to the defendant? Do you appreciate that that's very devastating? I appreciate that it certainly chips away at the strength of the State's case. Chips away? Yes, Your Honor. But there's the DNA evidence. You have the bottle silencer. The DNA evidence, for example. They said, Your Honor, witness that he's the one, what, the Gatorade that he drinks from it? I'm sorry? He drinks Gatorade? His DNA would be in a Gatorade bottle that could be used later for somebody to sell a silencer. How is that conclusive? They also found his DNA in a hair follicle that was attached to the tape that was wrapped around the bottle. On top of the fact, again, you have Michael Bradley's testimony suggesting that Mr. Martin was, in fact, the one who assembled the bottle. You had two other items of evidence on that bottle, too. The bottle was found at the scene of the murder, not at his house. Absolutely. And you had the notion that the tape was shaped like the barrel of a gun. Also true. And then you had the hole in the bottom of the gun being from inside out, being created from inside out as opposed to being punched in. Also true. And on top of that, you have the detective's testimony suggesting that it, in fact, appeared to him to be a silencer. Could I go back and ask the sort of factual premise about something Judge Gregory was asking about? Do you agree that if we have to assume the jury would have totally discredited this witness's testimony, at that point do you agree there is no legal basis for giving this consciousness of guilt instruction? Assuming that her testimony is totally discredited, I think the court would not have given that instruction. Wait, is that a predictive matter or that the court would have no legal basis for giving it? I think it would depend on how the impeachment turned out. Let me rephrase. Do we need to assume, for purposes of the Brady analysis, that that instruction shouldn't have been given? In terms of AEDPA deference, yes. I think that the appellate court concluded that the jury instruction likely would not have been given. And it factored that into its analysis and concluded that, nevertheless, it was not objective. Nevertheless, the petitioner failed to meet his burden to demonstrate materiality. And, again, we argue that that is not an objectively unreasonable assessment of the case. Can I ask one other question? On remedy, I understand that you don't like the fact the district court only gave you 60 days Have you been able to identify a single case where an appellate court reversed a district court that only gave 60 days to retry someone? I do not have a specific case where it was reversed. All right. Thank you. Thank you. Ms. Sully. All right. Ms. Wolin. Good morning, Your Honors. And may it please the court, Nicole Whelan on behalf of Appellee Charles Brandon Martin. Mr. Martin was convicted of attempted murder as an accessory before the fact based on circumstantial evidence. Do you want to keep your voice up a little bit? Yes, sir. Thank you. An extremely close case. The jury rejected part of the state's theory. It acquitted Mr. Martin of solicitation to commit murder. Had the computer report been properly disclosed, there is a reasonable probability that at least one juror would have had reasonable doubt as to Mr. Martin's guilt as an accessory before the fact as well. Sherry Carter's testimony was the linchpin of the state's case. She testified that she saw Mr. Martin looking up gun silencers on the computer. According to Ms. Carter, Mr. Martin told her that silencers were illegal and only police could buy them. She also testified that after the shooting, Mr. Martin took the computer, saying that he was going to get rid of it because he didn't want it searched because of the things that they had looked up. Carter's testimony formed the basis for the state's theory of intent. The prosecutions argued that Mr. Martin's planning it for a little while shows the intent to kill. Her testimony also provided the basis for concealment of evidence instruction on which the jury could infer guilt. And the prosecution urged the jury to do just that. It said that he got rid of the computer because there was probably something on it that would have brought the police's attention to the fact that he had something to do with this murder or attempted murder. And the prosecution highlighted Carter's particular credibility. It said that the things she said are very powerful and she is someone who's very sane and very normal but caught up in a bad situation. But the police never turned over a computer report that would have allowed the defense to impeach Ms. Carter's testimony. And had defense counsel been able to use the state's own forensic analysis, a reliable source, to impeach her testimony, the state's case would have crumbled because the state would have no longer had evidence connecting Mr. Martin to the bottle as a silencer or forming the basis for intent. The state court gave you credit, assumed the exclusion of her testimony, and then reiterated in some detail the evidence that still remained in the case. And it seemed to me that somebody could disagree one way or the other whether that was enough, but it was quite a bit. They went on for quite a while. We don't see state court decisions that thorough on this kind of subject. And they went through all the evidence about the bottle, the DNA, the presence of the bottle there, the linkage of the bottle to Martin, and the fact that the bottle could not be used for – the hole was punched in out as if the bullet was going through and the barrel was shaped, the tape was shaped like the barrel of a gun, rectangular so to speak, and had black soot inside. These things all indicated they were at the scene where the murder was. And there was also evidence that she didn't drink Gatorade. But there's no question it was linked to Martin by a lot of evidence. And I don't know why we are in a position to go ahead and say that court got it all wrong. It seems to me this is a state process and only if the state went off the deep end and didn't follow federal law or constitutional law do we reverse. But to me they gave it a lot of attention. It's a hard thing to comply with AEDPA and say the state – we disagree with the state. That is not the standard whether we disagree. The standard is whether they got it so wrong that there really wasn't any ability to disagree. This court's review under AEDPA is to look at whether it was contrary to her unreasonable application of clearly established federal law. And it was. The Court of Special Appeals didn't even consider the elements of accessory before the fact or how this evidence was the state's only presentation and closing argument as to why Mr. Martin had the requisite intent to be guilty. Can I just posit I think if but for AEDPA you have a spectacularly strong case and my real question is just AEDPA. So can I start with contrary to because this is actually where I think you're weaker. I agree the state court occasionally said things that sound like weighing the sufficiency of the evidence. I will posit that that's true. I will also posit that the state court on multiple occasions recited the correct legal standard including at the beginning and the end of its analysis. Doesn't the Supreme Court's decision in Woodford versus Viscotti just say in situations where states courts use loose language we cannot assume they're contrary to. We have to give them the benefit of the doubt and the benefit of the doubt is when they say the legal standard correctly sometimes and arguably say it incorrectly sometimes we have to assume they were applying the correct legal standard. So doesn't that just dispose of any contrary to argument? I don't think it disposes of a contrary to argument, Your Honor. I think that it was contrary to because the Court of Special Appeals did what the Kyle's Court said that the dissent was doing. It just excluded the testimony and we know that from JA 743 footnote 14. That's where the Court of Special Appeals is describing its analysis. It says quote it's excluding Ms. Carter's testimony but that's not the complete Brady materiality analysis. It still has to look at how the impeachment and the computer report would have put the other evidence in a completely different light. It didn't do that and I think that's seen particularly in looking at Michael's testimony. The state, my opposing counsel got up and called Michael's testimony very compelling. We know that that's not true because this Michael's testimony formed the basis of the state's theory of solicitation before the fact. The solicitation before the fact discussion when it was in closing argument, this prosecution said that Gerald Burks was the shooter because he was with Martin the day of the shooting. They left together at the right time. They came back together at the right time. Burks was agitated. All of that comes directly from Michael's testimony. And so the acquittal on solicitation suggests that the jury already disbelieved Michael's testimony. And that makes good sense given the ways that Michael's testimony was incredible and already impeached. Michael had told Mr. Martin that he had told police that Mr. Martin had been at the house all afternoon of the shooting. That was in the first police interview that was lost by the police. And then he only changed his testimony and this goes to Judge Gregory's question to opposing counsel. He changed his testimony because Maggie McFadden told him that she was involved. That's at JA 2043. And the prosecution isn't accurately reporting the record when it says that the testimony was that Mr. Martin was threatening. The testimony suggests that the prosecution was the one that Ms. McFadden found threatening. Michael's testimony says she says that they brought her here and he was threatening, suggesting that the people who brought her there, the prosecution was threatening. So Michael's testimony was already incredible. He was testifying because of his sister who had access to the bottle and the tape that came from her house and was presented by the defense as an alternate suspect in the case. Michael had a prior conviction for obstruction for lying to police. He received two different benefits for his testimony and even at trial his testimony was confusing and inconsistent. He originally said that Frank and Mr. Martin had never spoken before. Eventually after prompting from the prosecution saying that they had in fact spoken, that Mr. Martin had given Frank a bag and saying to get rid of it. So we know that the Court of Special Appeals didn't properly credit the fact that Michael's testimony was already discredited and disbelieved by the jury on the solicitation count. And weak evidence becomes weaker if it's no longer corroborated. Without Ms. Carter's testimony tying the threads together, the state is left with Michael's already incredible testimony and DNA evidence. So I really struggled with this like what conceptually under Brady do we do? Do we assume like she just doesn't testify? And I agree there's language in Kyle's that suggests we do this broader thing that you're saying. But then what you were just saying pinged something so I was just looking for it. I remember when I was reading the state Court of Appeals opinion, this is on JA 739, where they say the parties assert that the proper way to do the Brady analysis is to disregard the witness's testimony. That starts to sound like what they're doing is what the parties, and I assume you were not his lawyer before the Court of Special Appeals, but if we posit for the sake of argument that before the Court of Special Appeals, everyone was assuming that the way you do this is just disregard her testimony, but don't do this broader, what impact does it have on the state's case? What does that do? Your Honor, I don't think the parties can change the legal analysis that the court is supposed to do. But it's not contrary to an unreasonable application of federal law to assume for the sake of argument that the party's joint articulation of the legal standard is correct. How is that contrary? Courts constantly write opinions where they say things like the parties agree that X is true about the law. We are not holding that X is true about the law, but nor are we interrogating that. We're deciding the case the way the parties frame it for us. Courts do that literally all the time. I certainly don't think that's what, looking at the briefing below, that's what was said. I think that saying that they look at Ms. Carter's testimony excluded is part of the analysis. I think that you look to the fact that Ms. Carter... Not that we conduct a case-specific analysis of how badly would she have been discredited. We just throw her whole testimony out. Right, if you consider, and the court says that in Strickland, I'm sorry, Strickler, that it's either severely impeached or excluded entirely. That's the Brady materiality analysis. I think that the parties, Mr. Martin's counsel below, it was clear that you do a full sum Brady analysis. You don't simply stop there. You still look at how the whole case would have been painted in a different light as Kyles directs. So can I move us to unreasonable application? What is your best case? I assume it's Kyles? Yes, I think Kyles is the most obviously on-point case. It has discussion of where eyewitness testimony is critical and that that testimony is impeached. Here we know that Ms. Carter's testimony was critical because she was part of the testimony for intent. She tied the threads together. Kyles directs that we look at the likely damage of the case by looking at the word of the prosecutor. Here we have what the prosecutor said in closing argument, which was how credible she was. It is asking, urging the jury to adopt the consciousness of guilt based on the concealment of evidence instruction. It provided the evidence at her. It cited to Ms. Carter's testimony as evidence of intent. And Kyles also makes clear that not every piece of evidence must has to be undercut for evidence to material. I can use cards on the table. My biggest concern about Kyles, in Kyles there's a whole, there's multiple pieces of suppressed evidence. And the court goes through those multiple pieces. And again, let's posit for the sake of argument that if we're not in Edpa land, I think you've got a really, really strong argument. But why isn't that enough to say that it's not an unreasonable application of Kyles? Because Kyles involves multiple pieces of evidence and more extensive and significant suppression than we have here. I don't think that Kyles turns on the fact that there are multiple pieces of evidence. And I don't think that that is required in order for a case to be an unreasonable application of clearly established Supreme Court law. I think there are cases that are, that this court has held are unreasonable applications that don't. Which we, in this bizarre world of Edpa, have to pretend don't exist, right? I think yes and no, Your Honor. I think that those cases as applying the 2254 D1 standard are helpful because they look to how this court has already articulated clearly established Supreme Court law. We're not looking to them for having created more law. Just that they're illustrative of what is clearly established. So what we can't say is this violates clearly established federal law because here's another case where we held this violates Brady. We can't do that. That's the thing Edpa says we can't do. Yes, Your Honor. But I think you can say that it's clearly established and look to those cases as to exploring what has already been clearly established by other panels. And I think I do want to turn briefly to the DNA evidence because opposing counsel in the reply brief spends a lot of time trying to explain how Mr. Rock's DNA or DNA consistent with Mr. Rock's could be on the bottle. I think that that just demonstrates that there are innocent explanations for how DNA can get on a movable object at a crime scene. There are innocent explanations for how DNA consistent with Mr. Martin's is at the crime scene. And without Ms. Carter's testimony to point to the bottle as a silencer and that Mr. Martin had been researching silencers, those innocent explanations become more persuasive to the jury. Can I ask you about something factually that I didn't see addressed in your brief? The whole this could have been a bong. What do we do with the detective's testimony that I smelled this and it didn't smell like marijuana? Isn't that pretty bad for this could have been a bong? I don't think it is pretty bad, Your Honor. I think that there is no testing of the bottle to know what the substance was. It could have been used a lot earlier and the smell could have dissipated. We simply don't know and it's the prosecution's burden to prove that it was a silencer. And I do want to point out that the- How do you point out the other evidence about the bottle? For instance, the shape of the tape like the barrel of a gun, which doesn't fit any other hypothesis. And then the fact that the hole in the bottom of the bottle was created by an object going from inside out, not being punched in. And wasn't there testimony that- Did somebody give an opinion that that was a silencer? No one gave an opinion that it was a silencer, Your Honor. The sergeant who testified, testified that he noticed the bottle at the crime scene during his walkthrough because it reminded him of a movie silencer. Not that he testified that it was his opinion that it was a silencer. No one even provided an expert opinion that Gatorade bottles could be used as silencers. And the statement that it was punched out, not in, came from the prosecution in closing. That wasn't evidence in the record. There was- The bottle was in the record. I looked at the bottle picture. I mean, it's obvious it's punched out. All you have to do is look at the picture. There's two or three pictures in there. I think the jury could have looked at it and come to a variety of conclusions, Your Honor. But there wasn't evidence that what the characteristics of a bottle silencer are, how bottle silencers are formed, how they're used. I understand that. I understand that. But the fact that this was pushed out, this all was overlooked by the district court. The fact that the tape was shaped like the barrel of a gun. It was rectangular or two parallel sides. And there was a dark color inside that didn't smell like marijuana. And there was a hole punched out. And it was shown on the picture of the bottle. You can see the plastic pushing out in the evidence. This is all pretty inconsistent with the notion that it's some kind of smoking device. I don't know that it's inconsistent, Your Honor. I think that the prosecution had to prove that it was inconsistent. And I don't think that they did that. But even if the prosecution had proved that it was a silencer, the prosecution still had to prove that Mr. Martin was the responsible party for constructing the silencer. And without Ms. Carter's testimony- They had that hair on the tape. And they had two aspects of DNA linked to him. They had hair on the- They had the bottle. They had evidence of the tape. And they had evidence of Bradley and Martin going upstairs and doing something with that tape and with the bottle. They had hair on the tape. They also had a cat hair on the tape as well. And their own technician testified that hairs can be in the environment for up to a week. And then we shed 100 hairs a day. No, but the whole thing is a common sense thing. The fact that there's a cat hair on there, what's that got to do with it? I mean, sure, that's important because it shows that they went in detail to examine it. But the affirmative evidence, when you shoot from so many angles at a particular point, it gets to a point where there's no doubt of what's going on. I think the cat hair is important because it shows that there are innocent explanations for hairs being on tape that aren't the only reason that the hair is on the tape is because that person constructed the bottle. And the fact that it was found- It's not the only reason. The fact is that he drank Gatorade. They went up. Bradley and Martin put this thing together. It appears at the scene. Well, Your Honor, there's not evidence that it's the same bottle that Michael testified to that was at the scene. In fact, there's- If it's not the same bottle, then how is it DNA? She didn't drink Gatorade at the house. It was at the murder scene lying on the floor there. Well, DNA consistent with Ms. Turok's is found on the bottle, and the state's theory can't explain that if the bottle came from Ms. McFadden's house. Frank's DNA isn't on the bottle, and the state's theory is that Frank heavily handled the bottle. He's the only person who the bottle is ever in someone's hands in Michael's testimony. So the state's theory isn't consistent with the DNA evidence because it can't explain the presence of Ms. Turok's DNA to the extent that it's hers in the same way to the extent that the DNA on the bottle is Mr. Martin's. And it can't explain the absence of Frank's DNA. Can I ask you on the- So there's two arguments you pursue factually in the brief. One is maybe this isn't a silencer, and maybe it's not connected to my client. But the thing I'm just trying to conceptually struggle with, let's assume for purposes of this question that the jury finds it is a silencer. What is the innocent explanation where it is a silencer, but it's not connected to the defendant? Like what is the factual scenario that that- So you need to posit that this is a silencer. I think the factual scenario for that is that someone at Ms. McFadden's house had access to a bottle that Mr. Martin drank from. Any number of people could have had access to it given the testimony that Mr. Martin drank quite a bit of Gatorade. And so Michael Bradley had access to it. Frank Bradley had access to it. The third brother, Dennis, was also at home. Perhaps it was constructed at a different time, and McFadden had access to it. So there are any number of people who may have had access to a bottle that Mr. Martin had drunk from. So just to clarify what you- So none of these involve a completely unrelated individual who has no connection to the defendant constructed the silencer. It would have to be someone who was in and around the defendant constructed the silencer. I think that it's plausible that someone unconnected constructed it, but assuming that because the DNA was consistent with DNA with Mr. Martin's and DNA with Ms. Turok's, it would make the most sense that it would be someone who was in and out of the home. And Michael testified to the fact that there were a number of other men who were in and out of the home. Ms. Turok was dating someone who similarly was unhappy with her pregnancy. So there were a variety of people who may have had access to a bottle that both Mr. Martin and Ms. Turok drank from. I see my time is up. Thank you. Mr. DiMasselli? Thank you, Your Honors. A few points. My opposing counsel suggested that Sherry Carter's testimony was the linchpin of the State's case, and that without her testimony, the State's case would have crumbled. We vigorously disagree. We think the appellate court assessed the record correctly and properly relied on Michael Bradley's testimony, the DNA evidence on the bottle, Martin's ownership of a .380 caliber handgun, Martin's comment to Frank Bradley to get rid of a paper bag shortly after the shooting, Martin's false alibi that he gave to the police, and, of course, the evidence of the motive to commit the shooting in the first place. So as Judge Niemeyer pointed out, there is no question that this bottle was linked to Mr. Martin. I think that there's also no question that this bottle was, in fact, a silencer, and that's what it was constructed for. That's what it was used for. Absolutely, the hole was punched out. You can see that in the photographic evidence. The bottle itself was admitted into evidence and provided to the jury. The prosecutor asked the jury in closing argument to find that that object was, in fact, a silencer, and based on the jury's ability to look at the physical characteristics of the bottle, they certainly would have concluded that that was, in fact, a silencer. There's a mention about the— Can I ask you to address the thing that your friend on the other side said at the very end? So let's posit this is a silencer. Let's posit that the witness in question doesn't testify. Let's posit that the consciousness of guilt instruction is not given. Why isn't there a reasonable probability that a jury could credit the defense? Like, fines. You heard her explanation that posits that it's a silencer, that nonetheless somebody else did this. Why isn't it reasonably possible that a jury could have credited that explanation if, again, we assume that this devastatingly bad testimony, I saw the defendant researching silencers, is out? I think your Honor actually articulated it quite well in that this bottle had to have been related to somebody. Clearly, the bottle came from— Yeah, sure. It's the woman who owns the apartment. It's the other guy in the apartment, many of whom are mad at the victim. Well, I think you start from there, and then you begin to parse it down. Then you have the DNA evidence. We have—and I wanted to make that point— Sure, he drinks Gatorade. That's where the DNA comes from. He has his hair follicle attached to the inside of the tape wrapped around the neck of the bottle. And then the bottle just happens to appear just several hours later at the crime scene. So it narrows the possible scope of the shooters and the people involved in this case. It was his gun. It was his gun involved. Presumably it was. No, there's no evidence that— There's no other gun. The others don't have that gun, right? That, I think, Your Honor— I saw you said there's no evidence that that was his gun. There's no evidence— Well, tell the truth of it. The fact of it is he has a gun that's similar, correct? That's absolutely correct. There's no evidence of it. They never found the murder weapon. Thank you. But that's the whole problem with this. The whole thing about this is just incredible that it's in the disjunctive. All results in the decision that was based on an unreasonable determination of the facts in light of the evidence presented at trial. That's the question. Here, I mean, it's just incredible to say that this was not devastating in terms of that was the key to the silencer. One, two, three people could have connected to the silencer, right? Even if that's positive, as Judge Heiden said, positive there was a silencer. So which one do you pick? Oh, this is the only person who researched silencer. What was the jury to do but to say, It's you, buddy. I mean, what's common sense? Did we lose our common sense in these cases? That's what the federal district court was looking at. Someone who sees trials and look at those, it's amazing to say it's not an unreasonable conclusion. The state court put stock into the other evidence in this case, including the DNA evidence. It was fair. You can tell by the summary. The summarization was, this woman here, you can believe her. Unlike these other people, maybe a little checkered. I'm just paraphrasing. But they buoyed her on an issue that was devastating to him and told the jury, You can assume that he did it if you believe he destroyed it, like she said he did. And you said that's a reasonable conclusion to say it wouldn't have made any difference. I don't see how you could do that in the sense of having any sense of trying cases in terms of a criminal case. Judge Niemeyer said it, that there's no question that this bottle is linked to Mr. Martin. It's the DNA evidence. It could have been linked to him, but it could have been linked to other people. But she brought home the thing. The person is to bring home the bacon. The bacon was, yes, he's the one sitting there saying, Look, I'm going to destroy this thing, I'm going to take this thing away. What would a jury do? He took it away and he's destroyed the computer. Nobody else did that. So, aha, it must be you. I mean, you had to just ignore every sense of common sense to say that that wasn't devastating. I disagree. I think, again, the state court was not. Maybe it's just me. Maybe it's just me. Maybe I'm like this federal district court judge. I just try to think that the great writ be something. Even though EPPA says it's there and Congress didn't, but it was found to be constitutional because they said that still the great writ exists. I don't see how the great writ exists in terms of habeas in these facts like this. They said this was not an unreasonable determination of fact. But go ahead. I see I'm out of time. Does the court have any other questions? Thank you very much. Thank you so much. We'll come down and greet counsel and take a short recess. The court will take a brief recess.
judges: Paul V. Niemeyer, Roger L. Gregory, Toby J. Heytens